UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB SILVERMAN,<br><br>    Plaintiff,<br><br>    v.<br><br>DORSEY LANE, et al.,<br><br>    Defendants. | Case No. 18-04510 BLF (PR)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br><br>(Docket No. 75) |

Plaintiff, a California state pretrial detainee, filed a *pro se* civil rights complaint under 42 U.S.C. § 1983, against officers at the Humboldt County Correctional Facility ("HCCF"). The Court found the complaint, Dkt. No. 1, stated cognizable claims and ordered the matter served on Defendants Lane, Ayala, and Twitchell.[1] Dkt. No. 13.

---

[1] As their first response, Defendants Davin Twitchell and Brenda Ayala filed a motion to dismiss, Dkt. No. 33, which the Court granted in part and denied in part. Dkt. No 54. The Court dismissed the excessive force claim against Defendant Twitchell and ordered him terminated from the action. *Id.* at 5-6. Having denied Plaintiff's motion for leave to amend, the Court ordered the matter to proceed solely on the excessive force claim against Defendant Lane and the failure to protect claim against Defendant Ayala as presented in the original complaint. *Id.* at 12-13, 16-17. Subsequently, Plaintiff was granted leave to file a proposed amended complaint regarding a water deprivation claim, but he never did so. Dkt. No. 67.

Defendants Dorsey Lane and Brenda Ayala filed a motion for summary judgement or, in the alternative, summary adjudication.[2]  Dkt. No. 75.  Plaintiff filed opposition, Dkt. No. 82, which the Court deemed timely filed, Dkt. No. 86.  Then nearly a month later, Plaintiff filed a second opposition, Dkt. No. 87, to which Defendants object in their reply.  Dkt. No. 88.

In filing a second opposition, Plaintiff provided no explanation as to why he was unable to include the arguments presented therein in the first brief, or any reason why the Court should accept this additional briefing.  Dkt. No. 87.  Plaintiff also filed a sur-reply to Defendants' reply, in which he fails to set forth any argument for why the Court should accept his additional briefing.  Dkt. No. 89.  In the order of service, the Court stated that any dispositive motion filed by Defendants would be deemed submitted as of the date the reply brief is due.  Dkt. No. 13 at 4.  Furthermore, Plaintiff did not obtain court approval prior to filing the additional papers as required under the Northern District's Civil Local Rule 7-3(d).  Accordingly, the Court will not consider the sur-reply or the second opposition filed by Plaintiff which were filed without prior court approval.

For the reasons discussed below, Defendants' motion for summary judgment is **GRANTED**.

## DISCUSSION

I. **Statement of Facts**[3]

At the time of the incident which is the basis for this action, Plaintiff was housed in cell S-544 at HCCF.  Norton Decl. ¶ 3, Ex. 1, hereinafter "Pl.'s Depo.," at 91:8-14.  During the weeks preceding the underlying incident that took place on July 1, 2018, Plaintiff had flooded the outside of his cell on several occasions.  Lane Decl. ¶ 3.  Plaintiff

---

[2] In support of their motion, Defendants submit the declarations of counsel David R. Norton, Dkt. No. 75-2, Defendant Dorsey Lane, Dkt. No. 75-3, and Defendant Brenda Ayala, Dkt. No. 75-4.  With his declaration, Mr. Norton submits excerpts from Plaintiff's deposition taken on September 19, 2019.  Dkt. No. 75-2.

[3] The following facts are undisputed unless otherwise indicated.

testified at his deposition that he would "abuse the water system" by taking sink and toilet water with a cup and throwing it out from underneath the door to his cell. Pl.'s Depo. at 22:6-23:22. Plaintiff also admitted that he engaged in a "pattern" of flooding the cell "in retaliation for [the Facility] not allowing me to watch the news." *Id.* at 24:9-22, 31:24-32:9, 32:18-33:10. Plaintiff estimated that he flooded the tier on seven occasion during a two-three week span prior to the July 1, 2018 incident which is the subject to this lawsuit. *Id.* at 35:5-13. In addition to the flooding, Plaintiff also threw trash out of his cell "to protest [the Facility's] evil ways" on approximately thirty occasions while he was an inmate at the Facility. *Id.* at 32:18-33:3, 93:25-95:11; Dkt. No. 75-2 at 60, 61 (Exs. B and C to Pl.'s Depo.). Plaintiff flooded his tier two days before the subject incident. *Id.* at 31:24-33:1. Plaintiff would flood and litter the tier in order to retaliate for not being granted access to watch the news or read the newspaper. *Id.* at 23:23-24:23, 33:4-34:11, 95:12-96:10.

The morning of July 1, 2018 began with Plaintiff throwing shredded paper out from underneath his cell door during morning trash pickup at around 6:15 or 6:20 a.m. *Id.* at 20:2-23:6. According to Plaintiff, Deputy Davin Twitchell turned the water off to Plaintiff's cell in "retaliation" for Plaintiff throwing the trash under the door. *Id.* at 20:2-22:5. Plaintiff did not flood the tier on this particular day as he "didn't have a chance to flood." *Id.* at 20:24-21:1. Deputies Twitchell and Defendant Ayala returned to the area outside of Plaintiff's cell in order to pick up the trash discarded by Plaintiff. *Id.* at 21:12-19. At this point, Plaintiff began to berate both Deputies by declaring towards Deputy Twitchell that, "I heard your dad was a military soldier and he died at war. Probably better he's dead than have to raise two pieces of shit… You're lying. Corrupt. You're a criminal behind the badge. You're both disgraces to the badge. Pieces of shit; may you be cursed." *Id.* at 142:23-143:18.

According to Plaintiff, at approximately 9:00 a.m. he asked for water, and Defendant Ayala provided him with two half cups of water. *Id.* at 26:13-23. Upon

3

receiving the cups of water, Plaintiff berated Defendant Ayala with names. *Id.* at 29:1-30:25. During the period that the water was shut off, while Deputies checked on Plaintiff's status approximately every 30 minutes, Plaintiff covered the window to his cell with paper in order to force the Deputies to physically enter his cell or open the tray slot so he could "barter" for more water. *Id.* at 47:3-48:11.

According to Plaintiff, he was deprived of water from 9:00 a.m. until 1:00 p.m. *Id.* at 40:4-8. Plaintiff states that he had another interaction with Defendant Ayala, Deputy Twitchell and Defendant Lane at approximately 1:00 p.m. According to Plaintiff, Defendant Ayala and Deputy Twitchell would not give him water, so they called Defendant Lane over to Plaintiff's cell and Defendant Lane agreed to turn the water on in Plaintiff's cell so that he could fill up his cups. *Id.* at 40:9-41:19. According to Plaintiff, when Defendant Lane turned on the water to Plaintiff's cell, the water pressure was too high and caused Plaintiff difficulty in filling his cup, especially given that he tried to fill the cup with one hand because he refused to move the other arm from the food tray slot to prevent the deputies from closing it. *Id.* Plaintiff claims that he asked Defendant Lane to turn down the water pressure, which he did, but Plaintiff was unable to fill his water because Defendant Lane shut off the water too quickly. *Id.* at 41:22-42:16. As the Deputies left the area, Plaintiff called them "pieces of shit." *Id.* at 42:13-16. Plaintiff admits he called Defendant Ayala a "piece of shit" several times that day." *Id.*

According to Plaintiff, at approximately 1:30 p.m., while the paper cover remained on his cell door, Plaintiff began ignoring Defendant Ayala's 30-minute checks for updates pertaining to his status in order to get them to either open the door or the tray slot. *Id.* at 48:12-49:14. Plaintiff continued to ignore Defendant Ayala's efforts of shining a light into Plaintiff's cell and repeated inquiries into his wellbeing, which caused Defendant Ayala to open the tray slot to Plaintiff's cell. *Id.* at 48:12-50:25. Once Defendant Ayala opened the tray slot, Plaintiff proceeded to place one of his forearms on the tray slot. *Id.* at 51:1-19, 53:2-12. Plaintiff claims that when Defendant Ayala told him to put his arm back into his

4

cell, he said no and requested water, to which he claims Defendant Ayala responded that Plaintiff already had water. *Id.* at 53:13-18. According to Plaintiff, a verbal dispute over the water ensued. *Id.* at 53:19-22. Plaintiff estimates that Defendant Ayala asked him five times to put his arms back into his cell before contacting Defendant Lane. *Id.* at 58:5-14.

According to Defendant Ayala, at approximately 1:30 p.m., she asked Plaintiff if he wanted water. Ayala Decl. ¶ 4. In response, Plaintiff placed both of his arms through the food slot and handed Defendant Ayala four cups. *Id.* Defendant Ayala filled two cups with water and gave them back to Plaintiff, and then asked him to remove his hands from the food slot. *Id.* Plaintiff refused. *Id.* Defendant Lane was also present during this exchange. *Id.*; Lane Decl. ¶ 4.

According to Plaintiff, Defendant Lane approached the cell approximately 60 seconds *after* the interaction with Defendant Ayala. *Id.* at 54:2-8. According to Plaintiff, he also asked Defendant Lane for water, and Defendant Lane said that Plaintiff already had enough water for the day. *Id.* at 56:23-57:1. Plaintiff states that both Defendants Lane and Ayala asked him to remove his arms from the food tray slot and that he refused because he wanted them to provide him with water. *Id.* at 57:12-13; Lane Decl. ¶ 4; Ayala Decl. ¶¶ 4-5. Plaintiff's forearm was in a position that prevented Defendant Ayala from closing the food tray slot. Pl.'s Depo. at 58:22-59:2; Lane Decl. ¶ 4; Ayala Decl. ¶ 4. At no time did Defendant Ayala attempt to forcibly shut the food tray slot on Plaintiff's arms. *Id.* at 58:22-59:12.

Defendant Lane issued several commands to Plaintiff to remove his arms from the tray slow and informed Plaintiff that if he does not remove his arms, he would be tased. Lane Decl. ¶ 4; Ayala Decl. ¶ 5; Pl.'s Depo. 58:22-60:24; Video at 1:13-0:32. According to Plaintiff, he did not believe Defendant Lane would tase him. Pl.'s Depo. 50:8-24. At this point, Defendant Ayala began recording the interaction with Plaintiff with a department issued camera. Ayala Decl. ¶ 5; Pl.'s Depo. 172:22-174:8; 188:3-190:3, Ex. I ("Video").) After Plaintiff refused to remove his hands from the tray slot, Defendant Lane

5

drew his department issued taser and warned Plaintiff three times that he would be tased if he did not put his arms back into the cell; and then after calling out loudly, "taser, taser," Defendant Lane applied a three second "drive stun" to Plaintiff's forearm. Lane Decl. ¶ 4; Ayala Decl. ¶ 5; Pl.'s Depo. 60:25-61:25, 104:3-105:9; Video at 0:26-0:38. After the application of the taser, Plaintiff removed his arms from the tray slot at which point Deputy Ayala quickly closed the tray slot. Pl.'s Depo. 61:1-62:4; Ayala Decl. ¶ 6; Lane Decl. ¶ 4; Video at 0:37-0:43. A Facility deputy inquired as to taking a photograph of Plaintiff's tased forearm, to which Plaintiff consented. Pl.'s Depo. 118:7-120:4; Dkt. No. 75-2 at 62 (Ex. F to Pl.'s Depo.).

Based on Plaintiff's allegations regarding the July 1, 2018 taser incident, the Court liberally construed the complaint as stating cognizable claims against Defendant Lane for excessive force in violation of the Fourth Amendment, and Defendant Ayala for failing to protect Plaintiff's safety from another officer's use of excessive force. Dkt. No. 13 at 2.

## II. Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex*

*Corp.*, 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. *See Liberty Lobby*, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citations omitted). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id*. at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. *See T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence presented and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id*. at 631. The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.*

### A. **Excessive Force**

The Due Process Clause of the Fourteenth Amendment protects a post-arraignment pretrial detainee from the use of excessive force that amounts to punishment. *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979)). To prove an excessive force claim under § 1983, a pretrial detainee must show only that the "force purposely or knowingly used against him was objectively

7

unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).  "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* "A court (judge or jury) cannot apply this standard mechanically." *Id.* "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. at 396).

A non-exhaustive list of considerations that may bear on the reasonableness of the force used include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 135 S. Ct. at 2473.

Because the *Kingsley* standard applicable to excessive force claims by pretrial detainees is purely objective, it does not matter whether the defendant understood that the force used was excessive or intended it to be excessive.  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016) (en banc).  A pretrial detainee can prevail by providing "'<u>objective</u> evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.'" *Id.* (quoting *Kingsley*, 135 S. Ct. at 2473-74)) (emphasis in original).

Defendants assert that the use of force in this case was objectively reasonable as a matter of law.  According to Defendants, food tray slots in cell doors are used for the Facility's staff to interact with inmates.  Lane Decl. ¶ 5.  In particular, the tray slots are used by the Facility staff to pass meals to inmates and in any other situation in which the Facility staff need to physically hand something to an inmate.  *Id.*  It is common practice to require the food tray slots be closed when not in use by the Facility's staff.  *Id.*  The reason for this practice is officer and inmate safety.  *Id.*  An open food tray slot means that inmates are able to reach their arms outside of their cell, which could lead to inmates

8

throwing trash outside their cell door, reaching out and grabbing inmates or officers, or passing contraband between other inmates. *Id.* Defendants assert that on the day at issue, keeping the food tray slot closed on Plaintiff's cell was of particular importance due to Plaintiff's pattern of throwing trash and shredded paper outside his cell. *Id.* Defendants assert that the undisputed facts establish that in the days and weeks leading up to the incident, Plaintiff constantly threatened the institutional security and safety of the Facility's officers and inmates by trashing and flooding the tier outside his cell. Dkt. No. 75 at 15. Defendants assert that on the day of the incident, Plaintiff again berated jail staff and threw trash outside his cell door, and then manipulated jail staff to open his food tray slot by covering the windows of his cell and refused to allow them to close the slot until his demands were met. *Id.* at 15-16. Defendants assert that they requested voluntary compliance numerous times without success, and that Plaintiff was warned repeatedly that refusal to comply would result in the application of the taser. *Id.* at 16.

Defendants also assert that application of the *Kingsley* factors weighs in favor of granting them summary judgment. *Id.* at 16. First, Plaintiffs' blatant refusal to comply with the officers' commands necessitated the use of force. *Id.* Furthermore, the amount of force was the least intrusive to gain compliance because the brief application of a "drive stun"[4] taser on Plaintiff's arm presented a far less risk of injury to Plaintiff than applying physical force to his arms from outside the cell or opening the cell to go "hands on" with Plaintiff inside the cell. *Id.* Lastly, Defendants assert that there is no evidence to suggest that Plaintiff suffered any serious physical injury, and the Video demonstrates that officers

---

[4] The Ninth Circuit in *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011), explained the "drive stun" mode: "the operation removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode." In contrast, the "dart-mode" "delivers a 1200 volt, low ampere electrical charge [via a pair of 'probes']... [which] instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010).

9

attempted to reason with Plaintiff and warned him about the application of force numerous times. *Id.* Despite the attempts to reason with Plaintiff, he continued to resist their commands, thereby necessitating the use force on him to gain compliance. *Id.* Therefore, Defendants assert that the use of force in this case was objectively reasonable as a matter of law. *Id.*

In opposition, Plaintiff appears to assert that he suffered an injury due to the incident, including nerve damage, carpal tunnel syndrome, and tendonitis. Dkt. No. 82 at 2. He asserts that he needs medical attention but has suffered deliberate indifference and lack of treatment. *Id.* at 4. In reply, Defendants argue that Plaintiff's disapproval of the medical treatment following the incident is not a relevant factor in analyzing his excessive force claim. Dkt. No. 88 at 2.

The Court has viewed the Video submitted by Defendants in support of their summary judgment motion, attached to Plaintiff's deposition as Exhibit I. Pl.'s Depo., Ex. I. There is no dispute that this Video is the same video that was taken by Defendant Ayala on July 1, 2018, which was also shown to Plaintiff during his deposition. When asked whether it was "a fair and accurate depiction of the Taser incident that occurred that's the subject of this lawsuit," Plaintiff responded: "No… [b]ecause it doesn't show what led up to it and the accusations that they cast upon me before that they're – before and afterwards you're accusing me of calling them corrupt bitches and evil pieces of shit afterwards." Pl.'s Depo. 172:25-173:1-9. Upon further questioning, Plaintiff confirmed that it was him being tased in the video, it was Defendant Lane who tased him, and that Defendant Ayala was filming the incident. *Id.* at 173:17-174:8. Although Plaintiff rejects the Video for not showing the full context of the incident, i.e., the events leading up to this incident, there is no dispute that the Video was a true recording of the tasing incident as filmed by Defendant Ayala. *Id.* The Video, which is approximately 43 seconds long, begins with a focus on Plaintiff's arms sticking out of an open tray slot, later shown as cell "S4544," and remains focused on that area for the duration; no one's face is shown in the video  Pl.'s

Depo., Ex. I.  In front of this cell are two officers who have been identified by the undisputed accounts as Defendant Lane holding a taser gun, and Defendant Ayala operating the camera.  *Id.*  A male voice, presumably Defendant Lane, is repeatedly ordering Plaintiff to "get your hands in."  *Id.*  Plaintiff does not comply to the orders, all the while threatening to file a federal lawsuit for excessive force, even after Defendant Lane warns him several times that he will get tased if he does not comply.  *Id.*  The taser is then applied to one of Plaintiff's arms for approximately 2-3 seconds, at which point Plaintiff withdraws his arms into the cell and Defendant Lane quickly closes the slot.  *Id.*

      Viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is no genuine dispute as to any material fact relating to Plaintiff's claim of excessive force against Defendant Lane based on the tasing incident on July 1, 2018, and that the forced used was not objectively unreasonable after considering the *Kingsley* factors.  135 S. Ct. at 2473.  Even if the Court assumes as true that Plaintiff had been deprived of water in the manner he alleges prior to the incident, it does not justify his non-compliance with Defendants' repeated orders to remove his arms from the tray slot.  First of all, Defendants reasonably perceived that the open tray slot posed a threat to their safety in light of Plaintiff's recent disruptive behavior.  *Id.* at 12.  Plaintiff does not deny that he was engaging in disruptive behavior during the days and weeks prior to the incident, *i.e.*, throwing trash and flooding the outside of his cell.  *See supra* at 3-4.  Next with regard to what transpired during the actual tasing incident, Plaintiff's deposition and Defendants' declarations do not differ in any material respect: Plaintiff refused to move his arms from the tray slot even after several commands to do so, and that he continued to disregard their commands despite being warned that he would be tased if he did not comply.  *Id.* at 5-6.  Plaintiff clearly heard the warnings because he admits that he did not believe that Defendant Lane would actually tase him.  *Id.* at 5.  Accordingly, there is no dispute that Plaintiff was actively resisting.  Furthermore, the amount of force used was the least intrusive compared to the alternatives as set forth by Defendants, e.g., applying "hands on"

11

1  physical force to Plaintiff's arms from outside the cell or opening the cell and engaging in
2  a full altercation with Plaintiff inside the cell. *Id.* at 10. Next, Defendant Lane made an
3  effort to temper the amount of force by using the taser on "drive stun" mode and applying
4  it only long enough (no more than 3 seconds) to gain Plaintiff's compliance. *See supra* at
5  6. Only after Plaintiff failed to comply to his repeated orders and warnings did Defendant
6  Lane act to gain Plaintiff's compliance by applying a three second "drive stun" to
7  Plaintiff's forearm, which effectively caused Plaintiff to remove his arms from the tray slot
8  so that Defendants could close the slot. *Id*. Based on this evidence, Defendants have
9  shown that there is no genuine issue of material fact as to whether Defendant Lane applied
10 force in a good-faith effort to obtain Plaintiff's compliance with their orders to remove his
11 arms from the tray slot rather than maliciously and sadistically to cause harm.

12 The only dispute is the degree of Plaintiff's injury. Defendants assert that there is
13 no evidence to suggest that Plaintiff suffered any serious physical injury. Dkt. No. 75 at
14 16. In his complaint, Plaintiff did not allege any specific injury from the tasing incident.
15 Dkt. No. 1 at 3. Rather, in the relief section of the complaint, Plaintiff requested an "order
16 to enforce my hand to be treated," alleging that it is "numb in 2 fingers all the way down to
17 the wrist and tightened internally somehow." *Id.* There is no allegation that these
18 conditions were a result of the tasing on July 1, 2018. *Id.* Then for the first time in
19 opposition, Plaintiff alleges that he suffers from nerve damage, carpal tunnel syndrome,
20 and tendonitis. Dkt. No. 82 at 2. However, the evidence he submits with his opposition
21 are copies of notes from three medical visits, each taking place in October, November, and
22 December 2019. Dkt. No. 82-1 at 1-22. These relatively recent visits do not establish that
23 the alleged medical conditions he suffered in 2019 were caused by the single tasing
24 incident from the previous year in 2018. *Id.* Furthermore, in the notes from the December
25 3, 2019 visit, Plaintiff reported the following history with regards to his medical condition:

> "While [Plaintiff] at first attributes much of issues to having been in
> handcuffs in prison, he acknowledges that the weakness and electrical

>sensations well before 2013: first problem he noticed was numbness in the left medical wrist/medical dorsum of hand, then over time in 2016 he noticed wasting of intrinsic hand muscles including FDI and inability to move his interossei."

*Id.* at 1. Plaintiff states that his problems started "well before 2013," and nowhere does he attribute his injuries to a tasing incident in 2018. *Id.* Ultimately, this dispute over Plaintiff's injury is immaterial. Even if Plaintiff was injured to some degree by the tasing, the extent of injury suffered is just one factor to be considered under *Kingsley*. Based on the evidence submitted, the other *Kingsley* considerations discussed above indicate that the force used by Defendant Lane was not objectively unreasonable and that his actions were rationally related to a legitimate governmental objective of preserving institutional safety. *See supra* at 12-13; *Kingsley*, 135 S. Ct. at 2473-74. Accordingly, Defendants have met their initial burden of demonstrating the absence of a genuine issue of material fact with respect to the excessive force claim against them. *See Celotex Corp.*, 477 U.S. at 323.

The burden then shifts to Plaintiff to designate specific facts showing that there is a genuine issue for trial. *Id.* at 324. He must do so by going "beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admission on file." *Id.* Plaintiff has failed to meet this burden as his only argument in opposition is that he suffered serious injuries. *See supra* at 10. However, as discussed above, the extent of injury is merely one of several factors considered to determine whether Defendant used excessive force, and all the other factors indicate that Defendant Lane used objectively reasonable force.

Based on the evidence presented, Defendants have shown that there is no genuine issue of material fact with respect to Plaintiff's excessive force claim. *See Celotex Corp.*, 477 U.S. at 323. In opposition, Plaintiff has failed to point to specific facts showing that there is a genuine issue for trial, *id.* at 324, or identify with reasonable particularity the evidence that precludes summary judgment, *Keenan*, 91 F.3d at 1279. Accordingly, Defendant Lane is entitled to judgment as a matter of law on the excessive force claim

against him. *Id.*; *Celotex Corp.*, 477 U.S. at 323.

### B. Failure to Protect

Defendants assert that Plaintiff's claim for relief against Defendant Ayala is for failing to protect him from the alleged excessive force used by Defendant Lane. Dkt. No. 75 at 16-17. They argue that since Plaintiff's excessive force claim against Defendant Lane fails, his claim against Defendant Ayala necessarily fails. *Id.* at 17.

A prison official may be liable for failure to intervene if he or she is present when another official uses excessive force against a prisoner. *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995). A pretrial detainee bringing a failure-to protect claim must show that the prison official acted with deliberate indifference. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1068 (9th Cir. 2016) (en banc). But the standard is an objective one. *Id.* at 1068-70 (holding that objective standard of *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), applicable to excessive force claims brought by pretrial detainees, also applies to failure-to-protect claims brought by pretrial detainees). Specifically, a pretrial detainee need not "prove an individual defendant's subjective intent to punish in the context of a . . . failure-to-protect claim." *Id.* at 1070. A pretrial detainee who asserts a due process claim for failure to protect instead must prove "more than negligence but less than subjective intent -- something akin to reckless disregard." *Id.* at 1071.

The elements of a pretrial detainee's due process failure-to-protect claim against an individual officer are: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved -- making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries. *Id.* (footnote omitted). With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on

14

the facts and circumstances of each particular case. *Id.* (citing *Kingsley*, 135 S. Ct. at 2473).

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is no genuine dispute as to any material fact relating to Plaintiff's claim against Defendant Ayala because Plaintiff cannot establish all four elements for a failure-to protect claim. First with respect to the first two elements, there is no evidence that Defendant Ayala was responsible for the conditions that put Plaintiff at risk, i.e., the open tray slot. Rather, Plaintiff was the one who manipulated Defendants into opening the tray slot, and then refused to comply with their orders to withdraw his arms so that they could close it. Furthermore, it cannot be said that a reasonable officer in these circumstances would have appreciated the high degree of risk involved in a three-second tasing on "drive stun" mode which was applied no longer than necessary to gain Plaintiff's compliance. As discussed above, Defendant Lane's use of force was not objectively unreasonable. *See supra* at 11-12. Put another way, where there has been no underlying risk, i.e., excessive force, it cannot be said that Defendant Ayala was unreasonable for failing to protect against it. Lastly, it is immaterial whether Defendant Ayala's failure to intervene caused Plaintiff's injuries because none of the other elements have been satisfied. Under these undisputed facts and circumstances, it cannot be said that Defendant Ayala showed a reckless disregard to Plaintiff's safety. *See Castro*, 833 F.3d at 1071. Accordingly, Defendant Ayala is entitled to summary judgment on the failure to protect claim against her. *Celotex Corp.*, 477 U.S. at 323.

### C. Qualified Immunity

Lastly, Defendants assert that both claims against them should be dismissed based on qualified immunity. Dkt. No. 75 at 17.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

15

*Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. *Id.* at 205. A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling the sequence of the two-part test that required determining a deprivation first and then deciding whether such right was clearly established, as required by *Saucier*). The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. *Pearson*, 555 U.S. at 236 (noting that while the *Saucier* sequence is often appropriate and beneficial, it is no longer mandatory). "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and must, as in other cases, view the evidence in the light most favorable to the non-movant. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

"[A] right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.' In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (citations omitted) (law not clearly established whether officer may conduct a 'knock and talk' at any entrance to a home that is open to visitors, rather than only the front door); *accord Browning v. Vernon*, 44 F.3d 818, 823 (9th Cir. 1995) ("the contours of the right must be sufficiently clear so that a reasonable official would know that his conduct violates that right"). To define the law in question too narrowly would be to allow defendants to define away all potential claims. *See Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). Ultimately, however,

16

the dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier*, 533 U.S. at 202. A court determining whether a right was clearly established looks to "Supreme Court and Ninth Circuit law existing at the time of the alleged act." *Community House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 967 (9th Cir. 2010) (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)). In the absence of binding precedent, the court should look to all available decisional law, including the law of other circuits and district courts. *See id.*

With respect to excessive force, a plaintiff must identify "a case where an officer acting under similar circumstances… was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *see e.g.*, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (concluding that case involving police force employed in response to mere "*passive* resistance" to police was not sufficiently on point to constitute clearly established law); *Emmons v. City of Escondido*, 921 F.3d 1172, 1175 (9th Cir. 2019) (on remand from Supreme Court, Ninth Circuit held officer entitled to qualified immunity upon being "unable to find a case so precisely on point with [Emmons's case] as to satisfy the [Supreme] Court's demand for specificity"). While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate. *See Emmons*, 139 S. Ct. at 502-03 (rejecting as "far too general" Ninth Circuit's formulation of clearly established right in 4th Amendment excessive force case as "right to be free of excessive force"); *Orn v. City of Tacoma*, 949 F.3d 1167, 1171-73, 1178 (9th Cir. 2020) ("The plaintiff must instead identify precedent that holds 'certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'") (quoting *Saucier*, 533 U.S. at 202).

Qualified immunity operates in excessive force cases, then, to protect officers from the sometimes "'hazy border between excessive and acceptable force.'" *Id.* at 206 (citation omitted). In excessive force cases, qualified immunity can apply in the event the mistaken

17

belief was reasonable. *Id.* at 207-08. As late as 2006, for example, the law on the use of a taser (whether in dart-mode or in stun-drive mode) was not sufficiently clear; consequently, it could not be said that every reasonable official would have understood beyond debate that tasing a suspect who was not posing an immediate threat constituted excessive force under *Graham*. *Mattos v. Agarano*, 661 F.3d 433, 448 (9th Cir. 2011) (en banc) (holding that although use of taser constitute excessive force, defendant officers were entitled to qualified immunity).

Although the Court has determined that there was no Constitutional violation of Plaintiff's rights under Prong One of the Qualified Immunity test, for completeness, the Court addresses Defendants' arguments under Prong Two, that the law was not clearly established at the time of the incident. Here, there is no Supreme Court precedent prior to — or after — July 1, 2018, discussing whether tasing an inmate – be he a pretrial detainee or convicted felon – on "drive stun" mode for three seconds to gain compliance after numerous orders are ignored constitutes excessive force. Furthermore, Ninth Circuit precedent regarding the use of tasers indicates that qualified immunity protects officers who were reasonably mistaken in their use based on the lack of a clearly established right. *See, e.g., Bryan v. MacPherson*, 630 F.3d 805, 833 (9th Cir. 2010) (finding officer entitled to qualified immunity for use of taser against suspect not posing immediate threat where dearth of prior authority could allow a reasonable officer to make such a reasonable mistake of law); *Mattos*, 661 F.3d at 448; *Thomas v. Dillard*, 818 F.3d 864, 891 (9th Cir. 2016) (finding officer entitled to qualified immunity when, in September 2010, he used a taser on an suspect "who was unwilling to submit to what he perceived to be a lawful weapons search"); *Isayeva v. Barry*, 872 F.3d 938, 945-949 (9th Cir. 2017) (finding that no clearly established right was violated based on the relevant Ninth Circuit cases at the time of the incident such that deputy was entitled to qualified immunity for use of a taser against a resisting subject). Accordingly, even if Plaintiff had clearly demonstrated that he was subjected to excessive force on July 1, 2018, Defendant Lane is entitled to qualified

immunity because on July 1, 2018, a reasonable officer in his position would not have been on notice of clearly established law that his actions violated the Fourteenth Amendment. Furthermore, Defendant Ayala is entitled to qualified immunity because a reasonable officer in her position would have not been on notice of clearly established law holding that Defendant Lane was using excessive force, such that she was on notice that she would be liable for failing to intervene. Accordingly, Defendants' motion for summary judgment based on qualified immunity should be granted.

### D. Conclusion

Based on the foregoing, Defendants have established the absence of a genuine issue of material fact with respect to the claims against them. *See Celotex Corp.*, 477 U.S. at 323. In response, Plaintiff has failed to identify with reasonable particularity any evidence that precludes summary judgment. *See Keenan*, 91 F.3d at 1279. Accordingly, Defendants are entitled to summary judgment. *Id.*; *see Celotex Corp.*, 477 U.S. at 323. Furthermore, Defendants are entitled to qualified immunity on the claims against them.

## CONCLUSION

For the reasons stated above, Defendants Dorsey Lane and Brenda Ayala's motion for summary judgment is **GRANTED**. Dkt. No. 75. The excessive force and failure to protect claims against them are **DISMISSED** with prejudice.

The Clerk shall terminate all the other defendants listed on the docket since they were named in Plaintiff's amended complaint, which the Court denied leave to amend. Dkt. No. 54 at 12-13.

This order terminates Docket No. 75.

**IT IS SO ORDERED.**

Dated: ___June 30, 2020_____

BETH LABSON FREEMAN
United States District Judge

Order Granting MSJ
PRO-SE\BLF\CR.18\04510Silverman_grant-msj